IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARS, INCORPORATED,<br>6885 Elm St.<br>McLean, VA 22101,<br><br>                   *Plaintiff,*<br><br>   v.<br><br>JACEK SZARZYNSKI,<br>Chaussee de Tervuen 195<br>1410 Waterloo, Belgium;<br><br>JAB HOLDING COMPANY, LLC,<br>1700 Pennsylvania Ave., N.W.<br>Suite 801<br>Washington, DC, 20006; and<br><br>PRET PANERA HOLDING COMPANY, INC.,<br>1700 Pennsylvania Ave., N.W.<br>Suite 801<br>Washington, DC, 20006,<br><br>                 *Defendants.* | Civil Action No. _____<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR DAMAGES, AND DECLARATORY AND INJUNCTIVE RELIEF**

1. Mars, Incorporated brings this action to redress Jacek Szarzynski's theft of thousands of confidential and proprietary Mars documents, reflecting valuable trade secrets like highly-sensitive financial data. Szarzynski's misconduct did not stop there, however: he shared Mars' confidential and proprietary information with his new colleagues at JAB Holding Company, LLC ("JAB"), a Mars competitor he joined after a 24-year career at Mars.

\* \* \* \* \*

2. This story begins in a family kitchen over 100 years ago, when two members of the Mars family discovered their passion for sweets. Since then, the family owned Mars company, based in McLean, Virginia, has shared its affection for food with customers, creating

some of the best-known (and loved) brands in the world:  M&M's, Snickers, Twix, Milky Way, Skittles, and Uncle Ben's.

3.      Mars is not just synonymous with food; it has brought its science-powered business to pet care, creating products and services that pets, too, love:  brands like Pedigree, Royal Canin, and Whiskas, and pet-health services through Banfield Pet Hospital and VCA, Inc., among others.

4.      Szarzynski was a longtime Mars employee and executive who left Mars in February 2019 to become a partner in District of Columbia-based JAB and to serve as the Chief Operating Officer and Chief Financial Officer of its DC-based subsidiary, Pret Panera Holding Company, Inc.

5.      Pret Panera owns multiple food and drink businesses such as Panera Bread Company, Pret A Manger, Caribou Coffee Company, and Espresso House.  In addition, the JAB family of companies own a number of other coffee and food businesses, as well as a majority stake in Compassion-First Pet Hospitals and National Veterinary Associates.

6.      While still working for Mars, Szarzynski downloaded at least 6,166 documents from his Mars laptop, including thousands of confidential and proprietary Mars documents, onto a personal hard drive.

7.      The Mars documents Szarzynski took contained valuable trade secrets and competitively-sensitive information, including (i) Mars financial results at a product-by-product, country-by-country, and global level; (ii) financial projection data; (iii) forward-looking strategic business planning for Mars' businesses on a country-by-country basis; and (iv) Mars acquisition opportunities.  The filenames of the documents themselves confirm their value to Mars, and thus their business sensitivity.  By way of example:  "Vet Health International Strategy x Board-5-10-

18," "Portfolio assessment – Food View and summary of approach," and "Mars Inc strategy – Segment presentation – Food."

8.    Many of the documents bore no relationship to Szarzynski's then role at Mars. Indeed, although Szarzynski was then the Global Chief Financial Officer of Mars Petcare, he downloaded, for example, confidential documents related to Mars' food business, along with Mars Corporate information.

9.    Following his departure from Mars, Mars wrote to Szarzynski (and copied JAB) asking if Szarzynski had retained Mars information.  He denied any wrongdoing.

10.    Szarzynski's reply tracked similar correspondence Mars had received from other former Mars employees and executives who had departed for JAB, suggesting that JAB drafted, or participated in the drafting of, that response.

11.    Troubled by Szarzynski's pat response, Mars undertook a lengthy and expensive forensic examination to confirm Szarzynski's denials.

12.    Mars was right to be wary, as the examination of Szarzynski's Mars laptop revealed Szarzynski's theft.

13.    Confronted with those damning forensic results, Szarzynski backtracked, and both he and JAB admitted that he had indeed taken a trove of confidential Mars documents.

14.    The misconduct was even more egregious, however.  Szarzynski admitted both to uploading the confidential and proprietary documents onto a JAB-owned laptop and to sharing Mars documents with multiple JAB and Pret Panera colleagues.

15.    Not only was Szarzynski's misuse of Mars documents known to multiple JAB and Pret Panera employees, but also it apparently was not viewed as problematic.  As far as Mars can tell, no one at JAB flagged this unlawful activity as improper.  JAB and Pret Panera simply

accepted the Mars documents Szarzynski offered up without any concern for the legality (or morality) of this conduct.

## THE PARTIES

16.     Plaintiff Mars, Incorporated is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and corporate headquarters in McLean, Virginia.

17.     Defendant Jacek Szarzynski is a Polish national residing in Belgium who regularly conducts business in the District of Columbia.  Szarzynski is a partner in DC-based JAB Holding Company, LLC and the Chief Operating Officer of DC-based Pret Panera Holding Company, Inc.

18.     Defendant JAB Holding Company, LLC is a private limited-liability company organized and existing under the laws of the State of Delaware with its principal place of business and corporate headquarters in the District of Columbia.

19.     Defendant Pret Panera Holding Company, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and corporate headquarters in the District of Columbia.

20.     Non-party JAB Holding Company, s.à r.l. is a limited-liability company organized and existing under the laws of Luxembourg with its principal place of business in Luxembourg. JAB Holding Company, s.à r.l. is the ultimate parent company of JAB Holding Company, LLC; Pret Panera Holding Company, Inc.; and all other JAB-affiliated entities.

## JURISDICTION AND VENUE

21.     This action alleges violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.  The Court has subject-matter jurisdiction over that claim under 28 U.S.C. § 1331, and it

has jurisdiction over the remaining state-law claims under 28 U.S.C. § 1367 because they arise from a nucleus of operative fact common to the federal-law claim.

22.     The Court has personal jurisdiction over each of the Defendants.  JAB and Pret Panera are residents of the District of Columbia, and Szarzynski has the requisite contacts with the District of Columbia such that, under the circumstances, it is fair and reasonable to require him to come to the Court to defend this action because he purposefully availed himself of the benefits and protections offered by the District of Columbia.

23.     Szarzynski is a partner in DC-based JAB, a role he has publicly acknowledged, including on his LinkedIn profile.  He is also the Chief Operating Officer of its DC-based subsidiary, Pret Panera Holding Company, Inc.

24.     In these roles, Szarzynski regularly travels (and travelled) to DC for meetings at JAB and Pret Panera's DC offices, including taking trips to DC for that purpose while still at Mars.  Moreover, Szarzynski's theft and subsequent use and sharing of Mars' information was in furtherance of his work on behalf of these DC entities.  That Szarzynski was physically in DC for meetings with JAB and Pret Panera and also repeatedly interacted with others in DC supports the strong inference that he shared Mars' information in DC.  Additionally, as detailed below, Szarzynski defrauded Mars by incurring JAB-related business expenses in DC which were paid for by Mars because he falsely represented them to be Mars business expenses.

25.     Szarzynski is subject to DC's long arm statute, D.C. Code § 13-423(a), because: (i) he transacted business in DC; (ii) he contracted to supply services in DC; and (iii) he caused tortious injury in DC by an act or omission in DC.  In all instances, an exercise of personal jurisdiction over Szarzynski is consistent with the United States Constitution.

26.     Venue is proper in the Court under 28 U.S.C. § 1391(b)(2) because a substantial

part of the events that give rise to the claims occurred in DC, including for the reasons detailed in the two preceding paragraphs.

## FACTUAL ALLEGATIONS

I.   **SZARZYNSKI STOLE MARS' CONFIDENTIAL BUSINESS DOCUMENTS AS HE BEGAN WORKING FOR JAB AND PRET PANERA**

27.   Szarzynski started working for Mars in the mid-1990s as an employee; he later became a trusted executive.  Indeed, Szarzynski held executive positions in three different Mars businesses, serving as Global Chief Financial Officer of Mars Drinks from 2007 through 2012, Global Chief Financial of Mars Food from 2012 through 2015, and Global Chief Financial Officer of Mars Petcare from 2016 through the end of his 24-year tenure at Mars.

28.   On November 8, 2018, Szarzynski announced that he would be leaving Mars effective February 8, 2019 because he had "received a fantastic opportunity to work for JAB as a Partner and COO/CFO of Pret Panera."  In his resignation letter, Szarzynski promised that, until his departure, he was "fully committed to … deliver on [his] duties to the best exten[t] possible."

29.   When Szarzynski announced his intended departure, Mars had no reason to think he would betray the company in favor of JAB.  After all, on top of background law prohibiting him from misappropriating Mars' trade secrets and confidential information, Szarzynski also was legally barred from using Mars' information by confidentiality agreements (and stood to lose significant compensation if he violated them).  For example, one of those agreements precludes Szarzynski from "us[ing] or disclos[ing] 'Confidential Information,'"—which is defined as "information about the Mars businesses"—"outside of [his] employment with Mars and for any purpose other than the benefit of Mars."

30.   Moreover, at that time, Szarzynski worked in pet care, which was not then among JAB's business lines.  Unbeknownst to Mars, however, JAB was in the process of acquiring

veterinary hospital chains, which brought JAB into direct competition with Mars Petcare.

31.     Given his long tenure at Mars and his close relationship with Mars employees and executives, Mars attempted to ease Szarzynski's transition to his new employer.  Specifically, Mars paid for Szarzynski to receive tax advice about the effect of leaving Mars and joining JAB, and his Mars supervisor allowed him to take time off to attend a handful of JAB meetings prior to his departure from Mars.

32.     Szarzynski repaid these professional courtesies by repeatedly abusing Mars' support and trust.

33.     Even before he had revealed his intention to leave Mars, Szarzynski had taken steps to aid JAB at Mars' expense, performing work for JAB, traveling to meet with JAB personnel, communicating with JAB personnel by phone and by email, accessing numerous key Mars documents *unrelated* to the work he was then performing for Mars, and downloading thousands of confidential Mars documents to a personal hard drive.

34.     Szarzynski also billed Mars for his JAB-related travel expenses, without disclosing that they were JAB-related and without reimbursing Mars.

**A.      Szarzynski Downloaded Thousands of Confidential and Proprietary Mars Documents.**

35.     On August 21, 2018, Szarzynski accessed documents stored on a Mars intranet that included Mars' confidential and proprietary information about Mars' food business. Although Szarzynski previously had worked in this business, the documents would have been of no use to him in his then-current role as Global CFO of Mars Petcare.

36.     Szarzynski did not just access Mars confidential documents; he took them as well.

37.     For example, on September 1, 2018, he forwarded an email about Mars' search for a new CFO of Global Pet Nutrition to his personal Gmail account.  The email identified the

most desirable candidates and contained an attachment that detailed the work history and qualifications of these candidates.  Szarzynski did not have permission to forward this email to his personal account or retain it after he left Mars.

38.     That was just a warm up.  On September 16, 2018, Szarzynski installed two personal USB drives to his Mars laptop.  Shortly thereafter, he downloaded 6,166 documents to at least one of those drives.  Many were Mars confidential and proprietary business documents reflecting valuable trade secrets about strategic planning, potential acquisition targets, and profitability in particular markets.  Such documents are used in Mars' businesses.

39.     The filenames of the documents bear out their confidentiality and bespeak the valuable trade secrets in them.  They include, for example:

- "Vet Health International Strategy x Board-5-10-18"

- "Japan Market insights"

- "Portfolio assessment – Food View and summary of approach"

- "Mars Inc strategy – Segment presentation – Food"

Szarzynski, of course, had no right to take or retain any Mars documents.

40.     Mars safeguards its documents to protect them from public disclosure by (among other things) making confidentiality provisions part of employment packages, limiting access to confidential information to Mars personnel with a business need for the information, requiring Mars personnel to encrypt and password-protect confidential information when transmitting or storing such information electronically, requiring hard copies of documents containing confidential information to be shredded after use, requiring passwords to access Mars devices such as laptops, and requiring two-factor identification for remote log-in to Mars systems.

41.     As to executives like Szarzynski who have access to the most-sensitive business

documents, Mars further protects its information by conditioning incentive compensation on non-disclosure agreements.

42.     Szarzynski's downloading was massive and included a broad range of confidential and proprietary Mars documents about multiple global business sectors.  Despite the broad sweep of Szarzynski's theft, the forensic evidence shows that Szarzynski carefully targeted the Mars documents he unlawfully download.

43.     The metadata of the purloined files show the specific time each file was downloaded.  That metadata shows time gaps during the downloading, which establish that Szarzynski did not indiscriminately drag and drop or cut and paste.  Instead, he selected specific files and folders to take over an extended timeframe—leaving behind unwanted material.

44.     Further evidencing his conscious curating, Szarzynski maintained his electronic documents in a complex filing system with hundreds of carefully labeled folders and subfolders. The folder names Szarzynski used are descriptive, enabling him to know at a glance the types of documents contained in them.  Examples of the folders from which Szarzynski downloaded documents include "Strategy China Ambition 2025," "Segment FOOD Market_North America," and "TEAM_FoodFinanceLeadershipTeam."

45.     Some of the Mars documents Szarzynski downloaded related to the company's food business, which would have been no use to him in his then-current role as the Global Chief Financial Officer of Mars Petcare.

46.     Mars was not aware of Szarzynski's downloading at the time.  It came to light only through forensic examinations after Szarzynski's departure.  Nor does Mars believe that those examinations to date have uncovered the full breadth of Szarzynski's misconduct.

47.     For example, Szarzynski's September 16, 2018 downloading coincides with just

one of several instances when Szarzynski installed personal hard drives on his Mars laptop.  On three other instances (September 11, 2018, October 23, 2018, and December 4, 2018), Szarzynski was in DC—likely evidencing that he downloaded Mars information while in DC.[1]

48.     What the forensic evidence has shown to date may just be the tip of the iceberg.  That is the more plausible inference given Szarzynski's known (and, indeed, admitted) conduct.

### B.     Szarzynski's JAB and Pret Panera Meetings Coincided with His Mass Downloading and Installation of Personal Hard Drives.

49.     Around the same time he downloaded thousands of Mars documents, Szarzynski was negotiating a contract to become Chief Operating Officer and Chief Financial Officer of DC-based Pret Panera.

50.     Szarzynski also was beginning a series of conversations and meetings—in Belgium, Paris, London, and DC—with JAB and Pret Panera executives and employees.

51.     On October 4, 2018—less than three weeks after Szarzynski downloaded thousands of confidential Mars documents onto a personal hard drive and three weeks before he connected another personal hard drive to his computer (in DC)—Szarzynski met with JAB's CEO in Belgium.

52.     On December 4, 2018, while in DC, Szarzynski had another conversation with JAB's CEO.  This conversation occurred just hours after Szarzynski had installed yet another personal hard drive on his Mars laptop.

53.     A week later, on December 11 and 12, 2018, Szarzynski had FaceTime meetings

---

[1] In some instances, forensic traces allow experts to determine what a user did with an external hard drive based on analysis of the user's computer, even without access to the external drive itself.  That was the case with Szarzynski's September 16 downloading.  In other instances, such as Szarzynski's DC activity, access to the external drive is necessary to determine what the user downloaded.  Mars does not have access to the drives Szarzynski connected while in DC.

with JAB's CEO.

54.     On December 20, 2018, Szarzynski met with Pret Panera employees and executives at a consultant's Paris offices to discuss business strategy.

55.     A few days after that, Szarzynski had dinner in Rome with consultants he had previously worked with while at Mars to involve them in his new work for Pret Panera.  The consultants later worked with Szarzynski and Pret Panera on business strategy.

56.     In January 2019, Szarzynski traveled to the United States to visit Mars headquarters in McLean Virginia, but tacked on extra travel days for JAB and Pret Panera business in DC and London.

57.     Specifically, after attending to Mars business in Virginia and DC on January 7 and 8, Szarzynski shifted gears and performed work for JAB and Pret Panera on January 9 and 10 in DC, and January 11 in London.

58.     On January 9, Szarzynski attended a full-day meeting at JAB and Pret Panera's DC headquarters.  He began his day by stopping at a Panera restaurant for breakfast while en route from the Park Hyatt Washington, DC to JAB and Pret Panera's Pennsylvania Avenue offices, an expense charged as a Mars business expense.  (One wonders if he told his future colleagues that he visited their restaurant.)  After his full-day meeting ended, he attended a JAB team dinner at DC's Mirabelle restaurant before returning to his hotel.

59.      Although he had no Mars-related work on January 9 that required him to be in DC for another night, he nevertheless charged that evening's hotel room at the Park Hyatt as a Mars-related business expense.

60.     On January 10, Szarzynski had breakfast at the Park Hyatt's Blue Duck Tavern before heading to JAB and Pret Panera's DC headquarters for a half-day meeting.  Szarzynski

again charged this meal as a Mars business expense.

61.     After finishing his JAB business meeting, Szarzynski took an Uber to Dulles for a flight to London so that he could attend to further JAB business at JAB's London offices on January 11.  Szarzynski had Mars book and pay for his flight, and charged the Uber ride as if it were a Mars business expense.

62.     Once in England for JAB business, Szarzynski took the Heathrow Express airport rail into London and purchased a London Underground ticket for local travel.  Szarzynski had Mars book and pay for the airport rail ticket as if it were for Mars business; he submitted the London Underground ticket to Mars for reimbursement.

63.     In the several days after his January 11, 2019 JAB meeting, Szarzynski accessed documents stored on a Mars intranet, which included confidential information about Mars' food business.  (The folders accessed included titles such as "HH Panel Snackfood.")  Again, such food-related documents bore no relationship to the work Szarzynski was performing for Mars.  On one of the days that Szarzynski accessed these documents, he also opened files that appear to have been work for JAB, such as a document entitled "Pret Panera Holding Discussion v1."

64.     On January 21, 2019, Szarzynski had a FaceTime meeting with Tim Hennessy, the Minneapolis-based CFO of Caribou Coffee, a business owned by Pret Panera.

65.     Three days later, Szarzynski made a second JAB-related trip to London at Mars' expense.  He instructed his assistant to book a first-class round trip train ticket from Brussels to London for a meeting with JAB and falsely led his assistant to believe JAB would pay Mars back for the ticket.

66.     That same day, Szarzynski forwarded a Mars Petcare employee's analysis from his Mars email to his new JAB email account.

67.     In early February 2019, just prior to his formal departure from Mars, Szarzynski returned to DC for further meetings at JAB and Pret Panera's headquarters.  On February 4 through 8, Szarzynski attended meetings about Pret a Manger, Peet's Coffee, and Krispy Kreme Donuts, before moving on to New York for additional meetings the next week (after his departure from Mars) for Panera Bread.

68.     Neither Peet's Coffee nor Krispy Kreme Donuts are under the Pret Panera umbrella.  This is troubling.  JAB and Szarzynski have asserted that Szarzynski is "siloed" in Pret Panera and is not permitted to work on any other JAB business matters (and, in particular, that he is walled off from JAB's recently acquired veterinary businesses).  Szarzynski's work for other JAB brands suggests that, in practice, no such "silo" exists.

69.     In fact, Szarzynski emailed news articles about Mars' veterinary business strategy to top JAB executives.  That Szarzynski shared information about Mars' veterinary business with JAB—despite purportedly being walled off from that JAB business—increases Mars' concern that Szarzynski is using the confidential Mars pet care business documents he unlawfully retained following his departure from Mars to assist JAB.

## II.     SZARZYNSKI AND JAB'S STRATEGY OF DENIAL COMPOUNDS THEIR MISCONDUCT

70.     Mars has additional reasons to doubt Szarzynski and JAB's assurances, as Szarzynski and JAB repeatedly have made misleading and false statements about Szarzynski's misconduct.

71.     Mars' general counsel wrote Szarzynski (copying JAB) on May 19, 2019 to remind him of his ongoing obligations to Mars, including that he was precluded from using confidential Mars information in connection with his JAB work.

72.     In response, Szarzynski and JAB denied that Szarzynski had retained, used, and

disclosed Mars confidential information.  Indeed, Szarzynski:

- Agreed that he "cannot disclose, or use for [his] own benefit or the benefit of a third party, certain secret or confidential or private information relating to Mars' business or its clients, employees or directors."

- "[A]cknowledge[d his] on-going commitments" not to disclose "such confidential information."

- Asserted that he "had no intention to disclose any confidential information" that "would violate [his] ongoing obligations."

- Relayed a message from JAB that JAB had not used and would not use "confidential information of Mars" and that JAB "recognizes Mars' right to protect its confidential information."

- Conveyed that JAB would "assure" Szarzynski was "in compliance with" his "obligations to Mars."

73.     Those false assertions were of a piece with JAB-directed assurances that other former Mars executives and senior employees gave Mars after departing for JAB.  Over the years, several former Mars executives and senior employees have joined JAB.  Mars sent letters similar to that sent to Szarzynski to other former Mars individuals, with copies to JAB's Managing Partner and CEO.

74.     Each of those former Mars individuals responded by denying any wrongdoing and stating that he or she had not used Mars' information to aid JAB—like Szarzynski.  The letters' similarity suggests that JAB coordinated the responses.

75.     When Mars subsequently confronted Szarzynski and JAB with the results of Mars' forensic examination, they changed their tune, admitting that Szarzynski had taken and

retained Mars' confidential information.  Indeed, they conceded that Szarzynski continued to retain the Mars documents he had downloaded even after receiving the May 19, 2019 letter from Mars and that he had also uploaded Mars' documents onto his JAB-issued laptop.

76.     Szarzynski and JAB also admitted that Szarzynski repeatedly had shared stolen Mars documents with his new colleagues at JAB.

77.     Despite being caught red-handed, Szarzynski and JAB attempted to downplay their misconduct by making additional misrepresentations to Mars.

78.     Szarzynski and JAB asserted that Szarzynski's real purpose in downloading thousands of confidential Mars documents was to preserve his personal information.  They asserted that his personal information was "thoroughly intermingled" with his Mars documents, forcing him to "indiscriminately download[] all of his files" so that he would not "lose access to potentially important ... personal tax and financial documents, personal photographs, [and] personal communications."  Not so.

79.     *First*, Szarzynski's personal files and work files were not "intermingled"—the forensic evidence shows they were carefully sorted into clearly labeled folders and subfolders. If, for example, Szarzynski's goal were preserving personal photographs, he would not have gone looking for snapshots from his family vacations in folders labeled "Strategy China Ambition 2025" or "Segment FOOD Market_North America," both of which he downloaded onto his personal hard drive.

80.     *Second*, Szarzynski did not "indiscriminately download[] all of his files."  Rather, the forensic evidence shows he carefully selected the specific folders, subfolders, and documents within folders that he wanted to retain, leaving behind unwanted material.  This deliberate-selection approach was more time consuming than indiscriminate downloading.  It would have

been much faster simply to dump all of the documents onto an external hard drive than to pick and choose which documents to take.

81.     *Third*, Szarzynski's admitted actions *after* downloading the confidential Mars documents are wholly inconsistent with his purported justification for having done so in the first place.  If Szarzynski's goal were to preserve personal documents, he would not have needed to subsequently transfer confidential Mars documents to his JAB-issued laptop.  Nor would he repeatedly have provided confidential Mars documents to his new colleagues.

82.     It is disturbing that no one at JAB or Pret Panera sounded the alarm when presented with stolen Mars documents.  His new colleagues instead appear to have accepted the stolen confidential Mars materials without question.  Because JAB and Pret Panera's other employees and executives chose to acquire and retain Mars confidential documents, the harm to Mars was exacerbated.

83.     While JAB and Pret Panera failed to act, there can be no question they knew or had reason to know that Szarzynski was not permitted to use, retain, or share confidential Mars information.  As sophisticated business entities, JAB and Pret Panera know the law and common business practices.  And even if they did not, Mars copied JAB's CEO on its May 2019 letter to Szarzynski reminding him of his confidentiality obligations.  Szarzynski's response made clear that JAB understood that it could not review or use Mars confidential information:

> JAB has assured me that ... it has no intent to attempt to obtain or utilize confidential information of Mars in connection with the operation of Compassion-First Pet Hospitals or any of its other businesses.  JAB has indicated to me that it recognizes Mars' rights to protect its confidential information ....

84.     In fact, JAB's CEO recognized the competitive value of protecting JAB's own trade secrets in an email to Szarzynski prior to Szarzynski's departure from Mars:  "[I]t is always good to keep our secrets as a competitive advantage ...."

85.    And yet, Szarzynski's new colleagues did not sound the alarm when Szarzynski unlawfully shared Mars' trade secrets with them.  Perhaps the recipients' silence is explainable as a culture of wrongdoing at JAB and Pret Panera.  After all, management, up to JAB's CEO, had been warned that Mars suspected its confidential information might be improperly used by or shared by former Mars employees and executives.  Rather than come clean, JAB's executives chose to cover up the misconduct and were (at least) complicit in Szarzynski's lies.

86.    Consistent with their pattern of false denials, Szarzynski and JAB also initially asserted that Szarzynski had not billed Mars for JAB-related business expenses.

87.    Indeed, Szarzynski and JAB falsely asserted that Szarzynski had only attended two JAB-related meetings prior to departing from Mars, one in Paris in December 2018 and one in DC in January 2019.  The records of his JAB-related travel while working at Mars are far more extensive.  And when confronted with specifics of the instances Szarzynski billed Mars for that JAB travel, Szarzynski and JAB argued that the expense fraud that Mars had uncovered constituted an "innocent and immaterial" mistake.

88.    Szarzynski's actions were neither innocent or immaterial—Szarzynski repeatedly charged JAB-related expenses to Mars and had Mars book and pay for JAB-related travel, falsely claiming the expenses were related to his work for Mars.

89.    Against this backdrop of repeated wrongdoing, false denials, and minimization, Mars has no faith that anything short of a full forensic investigation of Szarzynski and JAB, followed by a permanent injunction barring their further use of Mars' documents and a Court-ordered purge of all Mars materials in their possession will remedy this situation.  Therefore, in addition to legal claims for damages, Mars also seeks equitable relief.

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT**
*Against All Defendants*

90.     Mars repeats and realleges each and every allegation set forth above and
incorporates them herein by reference.

91.     Szarzynski downloaded confidential and proprietary Mars business information to
a personal hard drive, uploaded confidential and proprietary Mars business information to his
JAB-issued laptop, and shared confidential and proprietary Mars business information on a
number of occasions with his colleagues at JAB and Pret Panera.

92.     The confidential and proprietary information relates to Mars products and
services, which are sold in interstate and foreign commerce.  Just by way of example, Szarzynski
downloaded confidential and proprietary information related to Mars brands such as Uncle Ben's
rice, which is sold nationwide and internationally.  Szarzynski also downloaded confidential and
proprietary Mars business information related to the nationwide and international food markets
and the nationwide and international market for veterinary services.

93.     The confidential and proprietary information Szarzynski downloaded, used, and
provided to JAB included Mars' trade secrets.

94.     Mars protects its confidential business information by (among other things),
making confidentiality provisions part of employment packages, limiting access to confidential
information to Mars personnel with a business need for the information, requiring Mars
personnel to encrypt and password-protect the confidential information when transmitting or
storing them electronically, requiring hard copies of documents containing confidential
information to be shredded after use, requiring passwords to access Mars devices such as laptops,
and requiring two-factor identification for remote log-in to Mars systems.  Such information was

accessible to Szarzynski by virtue of his high-level executive positions at Mars.

95.     In addition to limiting access to such information, Mars requires executives like Szarzynski who do have access to such information to sign contracts that restrict their ability to disclose and share such information.

96.     Mars' confidential and proprietary information, including its trade secrets, derive independent economic value from not being generally known to and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.  That information is used in Mars' businesses.

97.     Mars' trade secrets would be difficult and expensive for a competitor to acquire by fair means, and Mars spends a significant amount of money and effort in developing its trade secrets for its businesses' benefit.

98.     Looking just at the names of some of the documents bespeaks their confidentiality and importance to Mars:  "Vet Health International Strategy x Board-5-10-18," "Japan Market insights," "Portfolio assessment – Food View and summary of approach," and "Mars Inc strategy – Segment presentation – Food."

99.     Szarzynski had no right to take or retain Mars' information, which included documents concerning Mars' finances, strategic planning, potential acquisition targets, and profitability in particular markets.  Such information falls within the statutory definition of "trade secret," which includes "all forms and types of financial, business, scientific, technical, economic, or engineering information." 18 U.S.C. § 1839(3).

100.     JAB and Pret Panera knew or had reason to know that Szarzynski was not permitted to use, retain, or share confidential Mars business information, because of their background knowledge of statutory and common law and business practices, as well as because

Mars copied JAB's CEO on a May 2019 letter to Szarzynski reminding him of his confidentiality obligations.  JAB and Pret Panera nonetheless acquired Mars trade secrets from Szarzynski.

101.    Szarzynski, JAB, and Pret Panera are liable for these acts under 18 U.S.C. § 1836.

102.    To the extent that some of the relevant conduct occurred overseas, the Court can address that conduct under 18 U.S.C. § 1837 because acts in furtherance of the violation of the Defend Trade Secrets Act occurred in the United States.  Among other acts, in his capacity as COO of a DC-based company, Szarzynski shared Mars trade secrets with his United States-based JAB and Pret Panera colleagues.

103.    Mars did not authorize or consent to the disclosure or use of its trade secrets.

104.    Mars is entitled to compensatory damages for its losses caused by the misappropriation of its trade secrets under 18 U.S.C. § 1836(b)(3)(B)(i)(I), as well as damages for the unjust enrichment to Szarzynski, Pret Panera, and JAB by virtue of their misappropriation under 18 U.S.C. § 1836(b)(3)(B)(i)(II).

105.    Szarzynski's, JAB's, and Pret Panera's acts have been willful and malicious such that exemplary damages are warranted under 18 U.S.C. § 1836(b)(3)(C).

106.    Szarzynski's, JAB's, and Pret Panera's conduct also has caused irreparable and incalculable harm to Mars, and the injuries are ongoing.  Unless enjoined, Szarzynski's, JAB's, and Pret Panera's conduct will cause further irreparable and incalculable injuries—among others, the continued use of Mars' trade secrets in the furtherance of their own business—for which Mars has no adequate remedy at law.  Mars therefore seeks injunctive relief under 18 U.S.C. § 1836 (b)(3)(A).

## SECOND CLAIM FOR RELIEF
## VIOLATION OF THE DISTRICT OF COLUMBIA UNIFORM TRADE SECRETS ACT
### *Against All Defendants*

107.    Mars repeats and realleges each and every allegation set forth above and incorporates them herein by reference.

108.    Szarzynski downloaded confidential and proprietary Mars business information, uploaded confidential and proprietary Mars business information to his JAB-issued laptop, and shared confidential and proprietary Mars business information on a number of occasions with his colleagues at JAB and Pret Panera.

109.    Szarzynski is the COO of DC-based Pret Panera and was physically in DC for several meetings with JAB and Pret Panera personnel, supporting the conclusion that he shared Mars' confidential and proprietary information in DC.

110.    Szarzynski installed at least three personal hard drives to his Mars laptop while he was in DC, supporting the inference that he downloaded Mars information while in DC.

111.    The confidential and proprietary business information that Szarzynski downloaded, used, and provided to JAB and Pret Panera included Mars' trade secrets.

112.    Mars protects its confidential business information by (among other things), making confidentiality provisions part of employment packages, limiting access to confidential information to Mars personnel with a business need for the information, requiring Mars personnel to encrypt and password-protect the confidential information when transmitting or storing them electronically, requiring hard copies of documents containing confidential information to be shredded after use, requiring passwords to access Mars devices such as laptops, and requiring two-factor identification for remote log-in to Mars systems.  Such information was accessible to Szarzynski by virtue of his high-level executive positions at Mars.

113.    In addition to limiting access to such information, Mars requires executives like Szarzynski who do have access to such information to sign contracts that restrict their ability to disclose and share such information.

114.    Mars' confidential and proprietary information, including its trade secrets, derives independent economic value from not being generally known to and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.  That information is used in Mars' businesses.

115.    Mars' trade secrets would be difficult and expensive for a competitor to acquire by fair means, and Mars spends a significant amount of money and effort in developing its trade secrets for its businesses' benefit.

116.    Looking just at the names of some of the documents bespeaks their confidentiality and importance to Mars:  "Vet Health International Strategy x Board-5-10-18," "Japan Market insights," "Portfolio assessment – Food View and summary of approach," and "Mars Inc strategy – Segment presentation – Food."

117.    Szarzynski had no right to take or retain such Mars business information, which included trade secrets concerning Mars finances, strategic planning, potential acquisition targets, and profitability in particular markets.

118.    JAB and Pret Panera knew or had reason to know that Szarzynski was not permitted to use, retain, or share confidential Mars business information, because of their background knowledge of statutory and common law and business practices, as well as because Mars copied JAB's CEO on a May 2019 letter to Szarzynski reminding him of his confidentiality obligations.  JAB and Pret Panera nonetheless acquired Mars trade secrets from Szarzynski.

119.    Szarzynski, JAB, and Pret Panera are liable for these acts under the District of

Columbia Uniform Trade Secrets Act.

120.    Mars did not authorize or consent to the disclosure or use of its trade secrets.

121.    Mars has been damaged by Szarzynski's, Pret Panera's, and JAB's acts in an amount to be determined at trial.

122.    Mars is entitled to compensatory damages for its losses caused by the misappropriation of its trade secrets as well as damages for the unjust enrichment to Szarzynski and JAB by virtue of their misappropriation under D.C. Code § 36-403(a).

123.    Szarzynski's, JAB's, and Pret Panera's acts have been willful and malicious such that exemplary damages are warranted under D.C. Code § 36-403(b).

124.    Szarzynski's, JAB's, and Pret Panera's conduct also has caused irreparable and incalculable harm to Mars, and the injuries are ongoing.  Unless enjoined, Szarzynski's, JAB's, and Pret Panera's conduct will cause further irreparable and incalculable injuries—among others, the continued use of Mars' trade secrets in the furtherance of their own business—for which Mars has no adequate remedy at law.  Mars therefore seeks injunctive relief under D.C. Code § 36-403(a).

### THIRD CLAIM FOR RELIEF
### FRAUD
### *Against Szarzynski*

125.    Mars repeats and realleges each and every allegation set forth above and incorporates them herein by reference.

126.    During his tenure as a Mars employee, Szarzynski incurred expenses while performing work for JAB and Pret Panera.

127.    He submitted those expenses to Mars for payment, thus falsely representing to Mars that the expenses were for Mars-related business.

128.     Mars either paid for the JAB- and Pret Panera-related travel expenses directly or reimbursed Szarzynski for the expenses.

129.     Absent Szarzynski's misrepresentation that these expenses were incurred for Mars-related business, Mars would not have paid for or reimbursed Szarzynski for them.

130.     Szarzynski was aware that his statements were false and made the representation to Mars that these were Mars-related expenses with the intent to deceive.

131.     Although it is difficult to determine the full extent of Szarzynski's misrepresentations without the benefit of discovery, at a minimum Szarzynski improperly:

a. Charged breakfast at a Panera while en route to a JAB meeting in DC at 7:31 AM on January 9, 2019 to a Mars corporate credit card;

b. Subsequently submitted the receipt from Panera to Mars as if it were a Mars business expense when in fact it was not;

c. Charged a hotel stay at the Park Hyatt Washington, DC on the night of January 9, 2019 to a Mars corporate credit card (on the morning of January 10, 2019), although he conducted no Mars business that necessitated being in DC on that date;

d. Charged breakfast at the Blue Duck Tavern in the Park Hyatt Washington, DC on the morning of January 10, 2019 before a JAB meeting in DC to a Mars corporate credit card;

e. Submitted the receipt from the Park Hyatt Washington, DC including the January 9, 2019 hotel stay and the January 10, 2019 breakfast to Mars as if it were a Mars business expense when in fact it was not;

f. Charged an Uber ride to Dulles from JAB's DC offices on the afternoon of

January 10, 2019 for a flight to Heathrow to conduct JAB business to a Mars corporate credit card.

g.   Submitted the receipt for the Uber ride to his Mars assistant as if it were a Mars expense, forwarding her the email receipt from Uber at 3:04 PM on that January 10, 2019;

h.   Instructed his assistant, on December 19, 2018, to book a flight from Dulles to Heathrow for January 10, 2019 as if it were a Mars trip when in fact he was headed to JAB's London offices;

i.   Instructed his assistant, on December 19, 2018, to book a Business Class Heathrow Express airport rail ticket from Heathrow to Paddington Station in London on January 10, 2019 while en route to a meeting at JAB's London offices;

j.   Submitted a London Underground ticket purchased on January 11, 2019 for local travel within London while conducting JAB business (and not performing Mars-related work) to Mars for reimbursement as a business expense;

k.   Instructed his assistant, on January 1, 2019, to book a round-trip first class train ticket from Brussels to London for travel on January 24, 2019 to meet with JAB personnel in JAB's London offices, falsely assuring her that JAB would reimburse Mars for the JAB-related travel.

132.   As a result of Szarzynski's fraudulent travel charges, Mars has been damaged in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
## CONVERSION
### *Against Szarzynski*

133.    Mars repeats and realleges each and every allegation set forth above and incorporates them herein by reference.

134.    During his tenure as a Mars employee, Szarzynski incurred travel expenses while performing work for JAB.

135.    He submitted those expenses to Mars for payment, thus falsely representing to Mars that the expenses were for Mars-related business.

136.    Mars either paid for the JAB-related travel expenses directly or reimbursed Szarzynski for the expenses.

137.    Absent Szarzynski's misrepresentation that these expenses were incurred on Mars' behalf, Mars would not have paid for or reimbursed Szarzynski for them.

138.    Mars has been deprived of ownership, dominion, and control of the money it paid to Szarzynski as a result of Szarzynski's misrepresentation as to the nature of the travel expenses. As a result, Mars has been damaged in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT
### *Against All Defendants*

139.    Mars repeats and realleges each and every allegation set forth above and incorporates them herein by reference.

140.    Szarzynski, JAB, and Pret Panera obtained a substantial benefit from wrongfully obtaining, retaining, sharing, and using Mars' trade secrets.

141.    Szarzynski, JAB, and Pret Panera also obtained a benefit from Mars paying for Szarzynski's JAB-related business travel.

142.     Under the circumstances, it is unfair for Szarzynski, JAB, and Pret Panera to retain such benefits without payment.

143.     Mars has been damaged by Szarzynski's, JAB's and Pret Panera's conduct in an amount to be determined at trial.

## PRAYER FOR RELIEF

For the reasons set forth herein, Mars seeks the following in a judgment:

A.       An order permanently enjoining Szarzynski, and JAB, Pret Panera, and their respective officers, agents, servants, and employees, from possessing, using, or sharing with others any Mars confidential business information;

B.       For an order requiring Szarzynski, JAB, and Pret Panera to purge all Mars confidential business information and all material derived therefrom, which purge will be verified by an independent source that reports to the Court;

C.       For all other injunctive relief the Court deems appropriate;

D.       For an award of actual damages as measured by the losses caused by the misappropriation of Mars' trade secrets;

E.       For an accounting and disgorgement of profits or gains to Szarzynski, JAB, and Pret Panera through their misappropriation of Mars' trade secrets;

F.       For a finding that Szarzynski, JAB, and Pret Panera willfully and maliciously misappropriated Mars' trade secrets;

G.       For statutory exemplary damages based on Szarzynski's, JAB's, and Pret Panera's willful and malicious misappropriation of Mars' trade secrets;

H.       For an accounting and disgorgement of the benefits arising to Szarzynski and JAB from Mars' payment for Szarzynski's JAB-related business travel;

I.      For damages for Szarzynski's conversion of Mars property by misrepresenting

JAB business expenses to Mars as being Mars business expenses;

J.      For damages from Szarzynski's business-expense fraud;

K.      For an award of Mars' costs and reasonable attorney's fees as permitted by law;

L.      For pre-judgment and post-judgment interest according to law;

M.      For exemplary and punitive damages to the extent available; and

N.      For such further and additional relief that the Court may deem just and proper.

## JURY DEMAND

Mars demands a trial by jury on all issues properly tried to a jury.


Dated:  May 20, 2020

Respectfully submitted,

By: /s/ David Randall J. Riskin
Dane Butswinkas
     D.C. Bar No. 425056
David Randall J. Riskin
     D.C. Bar No. 992710
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
dbutswinkas@wc.com
driskin@wc.com

*Attorneys for Mars, Incorporated*
