UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARS, INCORPORATED,            )
                               )
           Plaintiff,          )
                               )
      v.                       )   Civil Case No. 20-01344 (RJL)
                               )
JACEK SZARZYNSKI, et al.,      )
                               )
           Defendants.         )



MEMORANDUM OPINION
(July 5, 2021) [Dkt. #20]

Plaintiff Mars, Inc. ("plaintiff" or "Mars") brings this action against its former executive, Jacek Szarzynski, and two companies in the corporate family for which he now works—Pret Panera Holding Co. Inc. ("Panera") and JAB Holding Co. LLC ("JAB")—to remedy the theft of trade secrets and fraudulent reimbursement of business expenses that allegedly occurred during Szarzynski's departure from Mars. *See* Compl. [Dkt. #1]. Plaintiff claims defendants violated the Defend Trade Secrets Act and the D.C. Uniform Trade Secrets Act (collectively the "trade secrets claims"). *Id.* ¶¶ 90–124 (Counts I and II). Plaintiff also alleges fraud, conversion, and unjust enrichment arising from Szarzynski's wrongful submission of JAB- and Panera-related business expenses to Mars (collectively the "reimbursement-related claims").[1] *Id.* ¶¶ 125–43 (Counts III, IV, and V).

---

[1] Counts III (fraud) and IV (conversion) are brought against only Szarzynski. Compl. ¶¶ 125–38. All other Counts in the Complaint are brought against all defendants. *Id.* ¶¶ 90–124, 139–43.

Presently before the Court is defendants' Motion to Dismiss ("Defs.' Mot.") [Dkt. #20], seeking dismissal of the claims against Szarzynski in favor of arbitration under the mandatory arbitration clause in his employment contract.[2] Defs.' Mot. at 3–15. I agree that the claims against Szarzynski must be resolved through arbitration. Accordingly, upon consideration of the parties' pleadings, relevant law, the entire record herein, and for the reasons stated below, I GRANT defendants' motion and DISMISS the claims against Szarzynski. Plaintiff's remaining claims against JAB and Panera are STAYED pending resolution of the arbitration proceedings.[3]

## BACKGROUND

Szarzynski, a polish national, worked for Mars and its subsidiaries from 1994 to 2019. *See* Compl. ¶¶ 1, 27. According to the Complaint, Szarzynski began his career as an employee but grew into a "trusted executive." *Id.* ¶ 27. Throughout his time with Mars, Szarzynski held executive positions in three different Mars businesses, serving as Global Chief Financial Officer ("CFO") of Mars Drinks from 2007 through 2012, Global CFO of Mars Food from 2012 through 2015, and Global CFO of Mars Petcare from 2016 through 2019. *Id.*

For his final two roles, Szarzynski relocated to Belgium, where he continues to

---

[2] Defendants also seek dismissal based on the Court's lack of personal jurisdiction over Szarzynski and the doctrine of *forum non conveniens*. *See* Defs.' Mot. at 16–28. Because I find dismissal warranted under the mandatory arbitration clause in Szarzynski's employment contract, I do not address these alternative arguments.

[3] JAB and Panera indicate they would voluntarily participate in arbitration proceedings "so that all of Mars' claims can be adjudicated at the same time and in the same forum." Defs.' Mot. at 15. Nothing in this Opinion restricts the parties' ability to resolve Mars' claims against JAB and Panera through arbitration should the parties agree to do so.

2

reside. *Id.* ¶ 17; *see also* Declaration of Jacek Szarzynski ("Szarzynski Decl.") [Dkt. #20-1] ¶¶ 12–13. Mars paid for the costs of Szarzynski's relocation, *see* Ex. E to Szarzynski Decl. [Dkt. #20-6], and Szarzynski avers that in these roles, he served "functionally . . . [as] an officer and senior executive of Mars divisions." Szarzynski Decl. ¶¶ 14, 20–35.

### A. Szarzynski's Employment Agreements

During his tenure, Szarzynski executed numerous overlapping contracts with Mars and its subsidiaries. Most relevant here are his last general employment contract (the "SED Contract") and a series of agreements governing bonus payments paid to Szarzynski as a senior Mars executive (collectively the "Incentive Agreements").

#### 1. The SED Contract

The terms of Szarzynski's day-to-day employment in his last role with Mars—Global CFO of Mars Petcare—were governed by the SED Contract.[4] Szarzynski executed the agreement with Mars Belgium NV ("Mars Belgium"), a Belgium subsidiary of Mars. *See* Ex. D to Szarzynski Decl. [Dkt. #20-5]. Belgium law governs the SED Contract, which provides that "[a]ny disputes arising out of or in relation with this Agreement and its termination shall be finally settled by arbitration in Brussels under the CEPANI Rules of Arbitration." *Id.* at arts. 13.1, 13.2. The agreement also addresses Szarzynski's confidentiality and reimbursement obligations. Article 5.5 provides that Szarzynski will be reimbursed for normal business expenses:

> Expenses incurred . . . in connection with the normal execution of this Agreement, such as representation, restaurant, hotel or travel costs, shall be

---

[4] Mars does not dispute the accuracy or authenticity of the SED Contract, conceding it is a valid, enforceable contract. Pl.'s Opp. to Defs.' Mot. to Dismiss ("Pl.'s Opp.") [Dkt. #25] at 3 n.1 ("Mars does not dispute the SED Contract is enforceable as between Szarzynski and Mars Belgium.").

reimbursed provided that such expenses are supported by proper evidence and are reasonable.

*Id.* at art. 5.5.

Article 9.1 provides a nondisclosure agreement, requiring Szarzynski to maintain confidentiality:

> The Director shall not either during or after [his employment] divulge . . . any secret or confidential or private information relating to the business or affairs of [Mars Belgium] or any Group Company[5] . . . .

*Id.* at art. 9.1.

Although executed by only Szarzynski and Mars Belgium, numerous provisions in the SED Contract reference other Mars-affiliated companies. For example, Article 2.2 provides a non-compete clause preventing Szarzynski from working for any company in competition with Mars Belgium or "any Group Company" during the term of the contract. *Id.* at art. 2.2. Article 7 prohibits the solicitation of the customers of "any Group Company" for a year following the termination of Szarzynski's employment. *Id.* at art. 7(i). Article 8 provides that the work created by Szarzynski during the contract "shall belong to the Company or, as relevant, any Group Company." *Id.* at art. 8. And, as already mentioned, Article 9 protects against the divulgence of confidential information relating to Mars Belgium "or any Group Company." *Id.* at art. 9.1.

    2.    *The Incentive Agreements*

In addition to the SED Contract, from 2014 to 2019, Szarzynski executed a series

---

[5] The SED Contract defines a "Group Company" as one that is "affiliated" with Mars Belgium under Article 11, 1 of the Belgium Companies Code. *See* Ex. D to Szarzynski Decl. at art. 2.1. Mars does not dispute that it falls within this definition.

4

of agreements directly with Mars under which he received incentive-based compensation as a Mars executive.[6] *See* Ex. H to Szarzynski Decl. [Dkt. #20-9]; Ex. I to Szarzynski Decl. [Dkt. #20-9]; Exs. 1–7 to Pl.'s Opp. [Dkts. ##25-3 to 25-9]. Like the SED Contract, the Incentive Agreements address confidentiality, conditioning Szarzynski's entitlement to an incentive-based bonus on his acceptance of a nondisclosure provision, which states,

> Non-Disclosure of Confidential Information. You may not use or disclose "Confidential Information" outside of your employment with Mars and for any purpose other than for the benefit of Mars. "Confidential Information" includes information about the Mars businesses (including products, trade secrets and finances) . . . and Mars Family members. . . .

*See, e.g.*, Ex. H to Szarzynski Decl. at App'x A, art. 3.

Unlike the SED Contract, the Incentive Agreements do not mention arbitration. Instead, they contain provisions entitling Mars to seek court orders under certain circumstances. For example, one "summary" provision states,

> Effect of Non-Compliance – Injunctive Remedies and Non-Entitlement/Repayment of Awards. If you do not comply with [the non-compete, non-solicitation, non-disclosure, and non-disparagement] provisions, Mars will suffer damages that entitle it to pursue injunctive remedies, which include court orders to enforce the non-compete, non-solicitation, non-disclosure, and non-disparagement provisions of the MSOP Plus legal plan rules.

*Id.* at App'x A, art. 5.

Another provision elaborates on this right to seek court orders:

> Supplement B - Restrictive Covenants. Award payments are conditioned on the Participant's adherence to the non-compete, non-solicitation, confidentiality, and non-disparagement provisions . . . . If such a breach or potential breach [of these provisions] should occur, the Participant agrees

---

[6] The Incentive Agreements have similar, although not identical, terms. For efficiency and convenience, the parties quote and rely on a single representative example. *See* Pl.'s Opp. at 11 n.4; Defs.' Reply at 7. I follow that practice here.

> that a Mars Group Member may immediately pursue temporary or permanent injunctive relief or a decree of specific performance by any court of competent jurisdiction enjoining any such breach or potential breach, in addition to enforcing the entitlement and clawback provisions under Subsections 4.2 and 4.4 and any other right or remedy to which they might be entitled.

*Id.* at App'x B, art. 4.1.

### B. Szarzynski's Departure from Mars

In 2018, Szarzynski received an offer to join the family of companies that includes JAB and Panera.[7] Compl. ¶ 28. Szarzynski announced that he would be leaving Mars early the following year. *Id.* Mars permitted Szarzynski to attend JAB-related meetings during the last few months prior to his formal departure. *Id.* ¶ 31. Thus, in the fall of 2018, Szarzynski met with JAB's CEO in Belgium, Washington, D.C., and several times over FaceTime. *Id.* ¶¶ 51–53. In January 2019, Szarzynski began participating in business meetings. *See id.* ¶¶ 57–69. On January 9 and 10, he attended JAB and Panera meetings in Washington, D.C. *Id.* ¶¶ 58–61. He then travelled to London for meetings on January 11 and January 24. *Id.* ¶¶ 61, 64. Finally, immediately prior to his formal departure from Mars, Szarzynski returned to D.C. to attend additional JAB and Panera-related meetings from February 4 through 8. *Id.* ¶ 67.

Plaintiff alleges that during this transitional period, Szarzynski sought to benefit his future employers at Mars' expense. *Id.* ¶ 33. Most critically, plaintiff alleges Szarzynski

---

[7] There is a fact dispute regarding the precise entity for which Szarzynski works. Plaintiff alleges, based on representations on Szarzynski's LinkedIn page, that Szarzynski is "a partner in DC-based JAB Holding Company, LLC and the Chief Operating Officer of DC-based Pret Panera Holding Company, Inc." Compl. ¶ 17. Szarzynski, however, avers that he "joined the Pret Panera Company Inc.," which is a Delaware corporation with "its executive leadership team" in London. Szarzynski Decl. ¶¶ 43–44.

downloaded thousands of confidential Mars documents and shared these with his future colleagues at JAB, Panera, and their associated companies. *Id.* ¶¶ 33, 35–69.

Through forensic analysis of Szarzynski's company laptop, Mars identifies several instances where Szarzynski emailed confidential documents to his personal email account or downloaded them to personal external hard drives. *Id.* ¶¶ 13–14, 15–69. On September 16, 2018, for example, Mars alleges that Szarzynski downloaded 6,166 documents to a personal external hard drive. *Id.* ¶ 38. Mars contends these documents were "carefully curated" by Szarzynski and contained trade secrets relating to multiple global business sectors. *Id.* ¶¶ 38–42.

Mars asserts that additional instances of theft likely occurred as well. *Id.* ¶ 46. In addition to the September 16 incident, Mars alleges Szarzynski connected an external hard drive to his computer on three separate occasions in the fall of 2018. *Id.* ¶ 47. Mars contends that, due to the limits of forensic analysis, it cannot identify whether additional documents were downloaded at these junctures.[8] *Id.* ¶ 47 n.1. But due to the timing of events, Mars alleges additional theft is likely. *See id.* ¶¶ 47–48, 52. For example, on one occasion, Szarzynski installed a personal hard drive on his computer just hours before meeting with JAB's CEO in Washington, D.C. *Id.* ¶ 52.

In addition to the theft of its trade secrets, Mars also contends Szarzynski wrongfully caused Mars to pay for JAB and Panera-related business expenses. *Id.* ¶¶ 125–43. Accordingly, Mars seeks compensation for the dining, hotel, and travel expenses incurred

---

[8] Mars alleges it requires access to Szarzynski's personal external hard drives to determine whether any documents were downloaded on these occasions. Compl. ¶ 47 n.1.

on Szarzynski's trips to Washington D.C. and London in January 2019 to the extent these were associated with JAB or Panera business activities. *Id.*

In May 2019, following Szarzynski's formal departure, Mars wrote to Szarzynski regarding his ongoing confidentiality obligations. *Id.* ¶ 71. Over the next year, the parties communicated with respect to Mars' confidentiality and reimbursement-related concerns. *Id.* ¶¶ 72–78; Szarzynski Decl. ¶¶ 4–8. Unable to reach a resolution, Mars brought this action on May 20, 2020 seeking damages as well as injunctive relief in the form of an order requiring defendants to purge all of Mars' confidential business information and enjoining defendants from using or disclosing this information. *See* Compl. at 27–28. On August 20, 2020, defendants moved to dismiss, asserting that Mars must arbitrate its claims against Szarzynski under the mandatory arbitration clause in the SED Contract. Defs.' Mot. at 1.

## ANALYSIS

The Federal Arbitration Act ("FAA" or "Act") "was designed to promote arbitration" and establishes "a liberal federal policy favoring arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345–46 (2011). Under the Act, written agreements to arbitrate are "valid, irrevocable, and enforceable." 9 U.S.C. § 2. Accordingly, district courts must submit disputes to arbitration "on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (citing 9 U.S.C. §§ 3–4).

Courts assess whether a dispute must be submitted to arbitration using the general tools of contract interpretation. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 69 (2010) ("[A]rbitration is a matter of contract."). Compelled arbitration is appropriate only where

8

the contract in question demonstrates an agreement to arbitrate the dispute. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) ("[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute."); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Wolff v. Westwood Mgmt., LLC*, 558 F.3d 517, 520 (D.C. Cir. 2009) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).

Although framed as a motion to dismiss, defendants' motion with respect to Mars' claims against Szarzynski is analogous to a motion to compel arbitration. *W. Sur. Co. v. U.S. Eng'g Co.*, 211 F. Supp. 3d 302, 305 (D.D.C. 2016). As such, it is reviewed under the summary judgment standard. *Id.* (holding summary judgment standard applied because motion sought "summary disposition" of the issue of whether or not the parties agreed to arbitrate the dispute); *see also Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 865 (D.C. Cir. 2008).

The normal evidentiary standards for summary judgment apply. *Sakyi v. Estee Lauder Cos., Inc.*, 308 F. Supp. 3d 366, 375 (D.D.C. 2018). The Court views the facts in the light most favorable to the nonmovant and draws all justifiable inferences in the nonmovant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The "party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Hines v. Overstock.com, Inc.*,

380 F. App'x 22, 24 (2d Cir. 2010). The party opposing arbitration then "must identify a triable issue of fact concerning the existence of the agreement" to avoid compelled arbitration. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002).

### *1.   Jurisdiction to Decide the Question of Arbitrability*

As a threshold argument, defendants contend the Court should not consider whether the SED Contract requires Mars to arbitrate its claims against Szarzynski because that question is reserved for the arbitrators in the first instance. Defs.' Mot. at 4–7. Generally, "courts presume that the parties intend *courts*, not arbitrators, to decide . . . disputes about arbitrability, including questions such as whether the parties are bound by a given arbitration clause." *W&T Travel Servs., LLC v. Priority One Servs., Inc.*, 69 F. Supp. 3d 158, 166 (D.D.C. 2014) (emphasis added). Parties to an arbitration agreement, however, may contract out of this general rule if they use "clear and unmistakable" language demonstrating an intent to submit gateway questions of arbitrability to the arbitral panel. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (cleaned up); *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) ("[P]arties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate."); *W&T Travel Servs.*, 69 F. Supp. 3d at 166.

Clear evidence of an intent to arbitrate gateway questions may be found where the arbitration agreement uses "broad, all-encompassing language" or incorporates arbitral rules that explicitly reserve gateway questions to the arbitrators. *See W&T Travel Servs.*, 69 F. Supp. 3d at 167 (holding threshold questions of arbitrability must be submitted to

arbitrators where the agreement stated "all claims, disputes and matters in question arising out of, or relating to, this Subcontract [must be submitted to arbitration]"); *see also Sakyi*, 308 F. Supp. 3d at 378 (holding threshold question of arbitrability must be submitted to arbitrators where the agreement incorporated American Arbitration Association ("AAA") rules stating that the arbitrators "shall have the power to rule on his or her own jurisdiction"). But where the party resisting arbitration is a nonsignatory to the agreement, courts generally independently assess gateway questions of arbitrability. *See, e.g., Oehme, van Sweden & Assocs., Inc. v. Maypaul Trading & Servs. Ltd.*, 902 F. Supp. 2d 87, 96–97 (D.D.C. 2012). This holds true even where the agreement utilizes broad language or incorporates arbitral rules reserving such questions for the arbitrators. *See Sakyi*, 308 F. Supp. 3d at 382–84 (addressing whether nonsignatories were third-party beneficiaries under an arbitration agreement without first considering whether that issue was reserved to the arbitrators).

Here, the arbitration provision in the SED Contract utilizes broad language mandating arbitration and incorporates the CEPANI rules, which, similar to the AAA rules, explicitly reserve questions of arbitrability for the arbitrators. *See* Ex. D to Szarzynski Decl. at art. 13.2; *see also CEPANI Arbitration Rules*, art. 7(3), THE BELGIAN CENTRE FOR ARBITRATION AND MEDIATION (Jan. 1, 2020) ("[If] a party raises one or more please concerning the existence, validity or scope of the arbitration agreement . . . the Arbitral Tribunal shall itself rule on its jurisdiction."). These considerations would ordinarily weigh in favor of having arbitrators resolve any disputes between the parties regarding arbitrability. *See, e.g., W&T Travel Servs.*, 69 F. Supp. 3d at 167. But Mars is a

11

nonsignatory to the agreement. Accordingly, the Court cannot hold that the arbitration provision's broad language or its incorporation of the CEPANI rules constitutes "clear and unmistakable" evidence of Mars' intent to arbitrate gateway questions of arbitrability. *See Oehme*, 902 F. Supp. 2d at 97 ("A signatory to a contract has clearly and unmistakably agreed to its terms, but that is not necessarily true of a nonsignatory."). Instead, I must independently assess whether Mars is bound to arbitrate its claims against Szarzynski.

### 2. *Whether Mars is Bound by the SED Contract*

Whether Mars is required to arbitrate its claims against Szarzynski depends on whether Mars, despite being a nonsignatory, is bound by the SED Contract.[9] This question is governed by the law of contract—in this case, Belgium law.[10] *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009) (holding the FAA does not "alter background principles of state contract law"); *National R.R. Passenger Corp. v. ExpressTrak, L.L.C.*, 330 F.3d 523, 529–30 (D.C. Cir. 2003) (applying law of contract to determine whether the parties must arbitrate); *Sakyi*, 308 F. Supp. 3d at 383 (same); *Kelleher v. Dream Catcher, LLC*, 278 F. Supp. 3d 221, 224–25 (D.D.C. 2017) (same); *Oehme*, 902 F. Supp. 2d at 100 (same). Defendants assert that Mars is bound by the SED Contract either as a third-party

---

[9] Mars does not dispute that the SED Contract is a valid and enforceable agreement. Pl.'s Opp. at 3 n.1. Nor does Mars meaningfully dispute that it presents claims "arising out of or in relation with," Ex. D to Szarzynski Decl. at art. 13.2, the SED Contract such that they would be covered by the scope of the arbitration clause therein if the agreement binds Mars. *See* Pl.'s Opp. at 8–20 (stating that "none of Mars' claims are based in the SED Contract" but declining to address whether Mars' claims are "in relation with" the SED Contract); *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074–75 (3d Cir. 1997) (holding that in order for a dispute to "aris[e] in relation to" an agreement, the dispute must only have a "logical or causal connection" to the agreement—it need not be "based upon" the agreement).

[10] Defendants state that either federal common law or Belgium law should apply but contend that the Court need not engage in a choice-of-law analysis because under either the outcome is the same. *See* Defs.' Mot. at 9 n.2.

12

beneficiary or under Belgium law principles equivalent to estoppel. Defs.' Mot. at 10. I agree that Mars is bound by the SED Contract as a third-party beneficiary and plaintiff's claims against Szarzynski must therefore be resolved through arbitration. How so?

### a. Third-party Beneficiary

Under Belgium law, a nonsignatory may be bound by an arbitration agreement as a third-party beneficiary.[11] *See* Declaration of Hanotiau ("Hanotiau Decl.") [Dkt. #20-15] ¶ 31; Report of Catherine Longeval ("Longeval Report") [Dkt. #25-13] ¶¶ 54–55. To become a third-party beneficiary, a nonsignatory must demonstrate acceptance or consent to the agreement containing an arbitration clause. Hanotiau Decl. ¶ 39 ("[W]hen a third party accepts a stipulation included in a contract in its favor, it becomes part of that contract."); Longeval Report ¶ 39 ("Under Belgian law, the extension of an arbitration agreement to a non-signatory requires that this party had *agreed* (at least implicitly) to be bound by the arbitration agreement." (emphasis in original)).

This acceptance or consent may be implied by the actions of the nonsignatory. *See* Longeval Report ¶¶ 56–57; *see also* BERNARD HANOTIAU, COMPLEX ARBITRATIONS: MULTI-PARTY, MULTI-CONTRACT AND MULTI-ISSUE 22–24 (2d ed. 2020). Merely being a parent of a signatory or in the same group of companies as a signatory is, without more, insufficient. HANOTIAU, COMPLEX ARBITRATIONS, at 102. Instead, Belgium law considers the totality of the circumstances and assesses whether the nonsignatory

---

[11] The same holds true under U.S. law. *See Arthur Andersen*, 556 U.S. at 631 (noting that "traditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, third-party beneficiary theories, waiver and estoppel" (internal quotation marks and citations omitted)).

"consciously participated" in the performance of the contract to a sufficient degree that an intent to be bound can be inferred from the nonsignatory's conduct. *See* Longeval Report ¶ 57. As one legal commentator states,

> The idea of extending the effects of the arbitration clause to the non-signatory having participated in the performance can . . . only be followed to the extent that the extension is based on the tacit consent of the non-signatory to be bound by the contract. This consent can be inferred from its conscious participation in the performance of the contract, and not from the objective situation consisting only of the implication of the non-signatory in the performance.

*Id.* (quoting M. Philippet, *L'implication dans l'execution du contrat comme indicateur du consentement tacite d'un non-signataire a etre lie par une clause compromissoire*, J.L.M.B., 2017–18 (translated from French)).

Defendants assert Mars is a third-party beneficiary because the SED Contract explicitly benefits Mars as a "Group Company" and Mars was consciously involved in the performance of the contract through its direction and control of Szarzynski's employment. Defs.' Mot. at 10–13; *see also* Szarzynski Decl. ¶¶ 20–35. I agree.

The SED Contract contains numerous provisions explicitly benefiting Mars as a "Group Company," including by prohibiting Szarzynski from joining Mars' competitors, soliciting its clients, misappropriating its intellectual property, or divulging its confidential information. *See* Ex. D to Szarzynski Decl. at arts. 2, 7–9. These provisions demonstrate an explicit intent to benefit Mars and generated protections which Mars enjoyed both during and after Szarzynski's employment. *See* HANOTIAU, COMPLEX ARBITRATIONS, at 22 ("[I]t appears to be a fundamental principle in all jurisdictions that if a third-party beneficiary wishes to benefit from the rights it has been conferred in a contract, it must also assume the obligations thereunder and in particular, the obligation to arbitrate any disputes

arising thereunder.").

Moreover, the SED Contract does not implicate Mars merely incidentally. Instead, the provisions inuring to Mars' benefit are necessary given the reality of Szarzynski's employment, which, although formally structured as a "self-employed director" of Mars Belgium, was in practice, at least to a substantial degree, directed and controlled by Mars. *See* Szarzynski Decl. ¶¶ 15–16, 20–35. Plaintiff does not dispute that Szarzynski functioned in practice as a Mars employee who worked on global brands that were not limited to any specific Mars subsidiary.[12] Szarzynski Decl. ¶ 27. Nor does it dispute that this work involved organizing major acquisitions of assets on Mars' behalf and frequently meeting with and taking direction from Mars' CEO and other senior Mars' executives. *Id.* ¶ 29. Indeed, plaintiff itself characterizes Szarzynski as a trusted Mars executive in the Complaint. Compl. ¶ 27.

This close coordination in the direction and control of Szarzynski's activities, combined with the explicit protections inuring to Mars' benefit in the SED Contract, render Mars a third-party beneficiary under Belgium law. *See* HANOTIAU, COMPLEX ARBITRATIONS, at 22; Hanotiau Decl. ¶¶ 28–36; *accord* THOMAS H. OEHMKE AND JOAN M. BROVINS, COMMERCIAL ARBITRATION § 8:11 (Dec. 2020 update) ("[E]vidence of the intent to make a third party the beneficiary of an arbitral contract may include: . . . referencing the third party in the contract . . . [circumstances where] a contracting party assumes a direct obligation to the intended beneficiary when entering into the contract . . .

---

[12] Plaintiff criticizes statements to this effect in Szarzynski's declaration as "products of Szarzynski's 'understanding'" but does not otherwise dispute the factual proffer. *See* Pl.'s Opp. at 18.

[and circumstances where] performance under the contract . . . directly benefits that third party."). Put differently, it is evident that Mars "consciously participated" in the performance of the SED Contract and accepted the benefits of that contract. *See* Longeval Report ¶ 57. As a result, Mars must abide by the terms of the agreement, including the obligation to arbitrate its disputes with Szarzynski.

Mars and its expert oppose this conclusion by arguing that Mars does not bring claims under the SED Contract and therefore should not be viewed as consenting to it. Pl.'s Opp. at 17; Longeval Report ¶¶ 56–59 (arguing that Mars was only "implicated" by the SED Contract and did not consciously participate in its performance in part "because Mars has not 'based its Claims' against Mr. Szarzynski on the SED Contract"). But there is no requirement under Belgium law that a third-party beneficiary must base its claims on the contract at issue in order to be bound by an arbitration agreement therein. *See* HANOTIAU, COMPLEX ARBITRATIONS, at 22–24. Neither Mars' expert nor the Belgium law cases she cites suggest otherwise. *See* Longeval Report ¶¶ 54–63. Thus, the fact that Mars did not frame its claims as breach of contract claims under the SED Contract does not insulate it from being considered a third-party beneficiary.

### b.   *Estoppel*

Defendants assert arbitration is also warranted based on equitable principles. Defs.' Mot. at 13–15. Under this theory, principles equivalent to estoppel exist under Belgium law and preclude Mars from premising its case on Szarzynski's confidentiality and reimbursement obligations stemming from his employment under the SED Contract while simultaneously avoiding the obligation to arbitrate thereunder. *See* Hanotiau Decl. ¶¶ 36–

38. Even assuming that equitable principles equivalent to estoppel exist under Belgium law, [13] I find no basis for their application here.

Under U.S. law, a nonsignatory may be compelled to arbitrate under the doctrine of equitable estoppel "if he or she knowingly seeks and obtains direct benefits from a contract, seeks to enforce the terms of that contract, or asserts claims that must be determined by reference to that contract." *See Oehme*, 902 F. Supp. 2d at 98 (cleaned up). When a nonsignatory embraces a contract and receives direct benefits from that agreement, the nonsignatory will be estopped from avoiding arbitration under the agreement when litigation ensues. *See id.* at 99 (citing *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517–18 (5th Cir. 2006)). However, when a nonsignatory plaintiff brings claims not based on the contract containing the arbitration clause, courts are reluctant to apply equitable principles to compel arbitration. *See id.* ("In the mine run of cases holding a nonsignatory bound under equitable estoppel, including those doing so based on the receipt of 'direct benefits' rather than the assertion of contract-based claims, the nonsignatory had sued the signatory based in part on the agreement at issue." (quoting *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 362 (5th Cir. 2003)). "The mere fact of a nonsignatory's affiliation with a signatory will not suffice to estop the nonsignatory from avoiding arbitration, no matter how close the affiliation is." *See Oppenheimer & Co. Inc. v. Deutsche Bank AG*, No. 09 Civ. 8154, 2010 WL 743915, at *2 (S.D.N.Y. Mar. 2, 2010).

Here, Mars does not bring claims based on the SED Contract. Instead, it alleges

---

[13] The parties' experts engage in a jurisprudential debate regarding the existence and prevalence of principles equivalent to estoppel under Belgium law. *Compare* Longeval Report ¶¶ 69–76 *with* Hanotiau Reply Decl. ¶¶ 17–19. The Court assumes, without deciding, that such principles exist.

statutory and tort theories of liability against Szarzynski. As such, contrary to defendants' suggestion, this is not a case where Mars seeks to "stand[] in the shoes of Mars Belgium" or "premises its entire case on" the SED Contract. Defs.' Mot. at 14–15. There is, accordingly, no equitable basis on which to compel arbitration.[14]

### c. Incentive Agreements

Mars' primary argument against compelled arbitration relies on the Incentive Agreements. To plaintiff, these agreements show that "Mars and Szarzynski expressly chose to resolve their confidentiality disputes in court—and plainly did not opt for arbitration." Pl.'s Opp. at 10. Accordingly, Mars argues the Court cannot compel arbitration with respect to its trade secrets claims under any theory.[15] *Id.* Unfortunately for Mars, the plain meaning of the Incentive Agreements fails to support its interpretation. How so?

As an initial matter, the Incentive Agreements solely govern the bonus program in which Szarzynski, as a Mars executive, was enrolled. *See, e.g.*, Ex. H to Szarzynski Decl. The agreements do not govern his day-to-day employment from which Mars' present claims arise. Nor do they contain forum-selection clauses or any requirement that all disputes between Mars and Szarzynski be resolved through court adjudication. Instead,

---

[14] The cases defendants rely on do not suggest otherwise. *See* Defs.' Mot. at 13–15. *Life Techs. Corp. v. AB Sciex Pte. Ltd.*—the single case defendants cite in which the court held a nonsignatory estopped—is dissimilar because there, unlike here, the nonsignatory plaintiff brought, *inter alia*, contract-based claims and directly invoked the agreement containing an arbitration clause. 803 F. Supp. 2d 270, 271–73 (S.D.N.Y. 2011).

[15] Plaintiff does not make the same argument with respect to its reimbursement-related claims. *See* Pl.'s Opp. at 11 (arguing the Incentive Agreements "demonstrate that Mars and Szarzynski expressly chose to resolve their *confidentiality disputes* in court" (emphasis added)).

the agreements permit Mars to pursue remedies in court only in certain limited circumstances—none of which have occurred here.

Plaintiff first relies on Appendix A of the most recent Incentive Agreement. Pl.'s Opp. at 11. This provision authorizes pursuit of court orders "to enforce the . . . provisions of the MSOP Plus legal plan rules." Ex. H to Szarzynski Decl. at App'x A, art 5. But plaintiff's Complaint never mentions the MSOP Plus legal plan and, as plaintiff reiterates in its briefing, none of its claims are based in contract—whether those be the Incentive Agreements or otherwise. Pl.'s Opp. at 17 ("Here, none of Mars' claims are based in the SED Contract (*or contract generally*)." (emphasis added)). Because the present claims do not seek to enforce the provisions of the MSOP Plus legal plan rules, this provision fails to confer the authority plaintiff seeks to read into it.

Plaintiff next cites Appendix B of the same agreement, but its argument fails for a similar reason. The language there states that "[i]f . . . a breach or potential breach should occur," Mars may seek "temporary or permanent injunctive relief or a decree of specific performance by any court of competent jurisdiction enjoining any such breach or potential breach . . . ." Ex. H to Szarzynski Decl. at App'x B, art. 4.1. Again, although it had the opportunity to do so, plaintiff elected not to bring any breach of contract claims based on the Incentive Agreements. *See generally* Compl.; Pl.'s Opp. at 17 ("The trade-secrets claims are statutory, existing irrespective of a contract . . . ."). Accordingly, plaintiff cannot rely on this provision to avoid its otherwise applicable duty to arbitrate. *See* Hanotiau Reply Decl. ¶¶ 11–13.

Finally, Mars argues the "court-litigation terms" in the Incentive Agreements that

were signed after the SED Contract "supersede any arbitration requirement." Pl.'s Opp. at 12 (citing Longeval Report ¶ 53). To replace a contract under Belgium law, however, a successor contract must manifest a specific intent to do so. *See* Hanotiau Reply Decl. ¶¶ 15–16. Here, no such intent is evident from either the face of the Incentive Agreements or otherwise. *See, e.g.*, Ex. H to Szarzynski Decl.; Hanotiau Reply Decl. ¶ 16.[16] Accordingly, the Incentive Agreements do not permit Mars to avoid arbitration.

## CONCLUSION

For all of the foregoing reasons, the Court GRANTS defendants' motion to dismiss as to Jacek Szarzynski and DISMISSES plaintiff's claims against him in favor of arbitration pursuant to the SED Contract. The Court further STAYS this case with respect to plaintiff's remaining claims against JAB and Panera, pending the outcome of the arbitration proceedings. An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

[16] Even if the Incentive Agreements did revoke the SED Contract's arbitration provision, this revocation would be limited by the terms of the Incentive Agreements. As I have already held, the terms of the Incentive Agreements are inapplicable here. Thus, any potential revocation does not affect the outcome with respect to arbitration.